**In re NASDAQ MARKET–MAKERS ANTITRUST LITIGATION.**

No. 94 Civ. 3996(RWS).

United States District Court,
S.D. New York.

April 14, 1997.

120

Fine Kaplan and Black by Arthur M. Kaplan, Philadelphia, PA, Lovell & Skirnick, L.L.P. by Christopher Lovell and Robert A. Skirnick, New York City, Milberg, Weiss, Bershad, Hynes & Lerach by Leonard B. Simon, San Diego, CA, for Plaintiffs.

Dickstein Shapiro Morin & Oshinsky by Howard Schiffman and R. Bruce Holcomb, Washington, DC, Sullivan & Cromwell by John L. Warden, Weil, Gotshal & Manges by Jay N. Fastow, New York City, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiffs in this multidistrict securities antitrust class action have moved to include institutional investors in the class and to certify five Louisiana retirement systems (the "Systems") as class representatives pursuant to Rules 23(b)(2) and (3), Fed.R.Civ.P. For the reasons set forth below, Plaintiffs' motion will be granted.

### Background

The parties, prior proceedings, related proceedings and facts in this action are fully set forth in several prior opinions of this Court, familiarity with which is assumed. *See In re Nasdaq Market–Makers Antitrust Litigation,* 894 F.Supp. 703 (S.D.N.Y.1995) ("*Nasdaq I* "); *In re Nasdaq Market–Makers Antitrust Litigation,* 164 F.R.D. 346 (S.D.N.Y.1996) ("*Nasdaq II* "); *In re Nasdaq Market–Makers Antitrust Litigation,* 1996

WL 187409 (S.D.N.Y. April 18, 1996) ("*Nasdaq III*"); *In re Nasdaq Market–Makers Antitrust Litigation,* 929 F.Supp. 723 (S.D.N.Y.1996) ("*Nasdaq IV*"); *In re Nasdaq Market–Makers Antitrust Litigation,* 169 F.R.D. 493 (S.D.N.Y.1996) ("*Nasdaq V*"). Those prior proceedings and facts relevant to the instant motion are set forth below.

The thirty-three named Defendants (the "Defendants" or "Market-makers") in this action are all leading market-makers on the Nasdaq exchange, a computerized securities quotations system operated by the National Association of Securities Dealers ("NASD").

Plaintiffs include thirty individual Plaintiffs who purchased or sold shares of Class Securities from one or more Defendants or their commonly owned affiliates during the period of May 1, 1989 to May 24, 1994.

Plaintiffs also include the Systems, whom Plaintiffs seek to add as class members and class representatives. The Systems are the Louisiana School Employees Retirement System, the Louisiana State Employees Retirement System, the Employees Retirement System of the Sewerage & Water Board of New Orleans, the Employees Retirement System of the City of Baton Rouge and the State of Louisiana District Attorneys' Retirement System.

By opinion dated November 26, 1996, the Court granted in part Plaintiffs' motion for class certification. The Court held that the State of Louisiana could not assert claims on behalf of the Systems. *Nasdaq V,* 169 F.R.D. at 506–08.

On December 10, 1996, the Systems filed their own complaint as additional class representatives (the "Systems' Complaint"). The Systems' Complaint is substantially identical to Plaintiffs' Complaint. On December 18, 1997, Plaintiffs filed a "Motion for Entry of an Order Confirming Class Definition." On January 14, 1997, the Court heard argument on Plaintiffs' motion and deemed it a motion to include institutional investors in the class and to certify the Systems as class representatives. Oral argument on the latter motion was heard on February 10, 1997, at which time the motion was deemed fully submitted.

*Facts*

For purposes of deciding a Rule 23 motion for class certification, the allegations set forth in the complaint are accepted as true. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). A detailed recitation of facts is provided in *Nasdaq V,* 169 F.R.D. at 501–03.

The class action complaint in this multidistrict action alleges that Nasdaq market makers had engaged in a conspiracy to restrain or eliminate price competition in violation of the Sherman Act, 15 U.S.C. Section 1. Plaintiffs have identified 1,659 Nasdaq traded securities which would have been affected by this alleged conspiracy. Plaintiffs allege that Defendants collectively refused to quote odd eighths, (e.g., 1/8, 3/8, 5/8, 7/8 and 9/8 of a dollar), in their quoted prices for securities. This refusal allegedly inflated the "spread" between purchase and sale price of securities, from which the Defendants derive their profits. *Nasdaq V,* 169 F.R.D. at 501–02. Plaintiffs cite a May 1994 study by Professors William G. Christie and Paul H. Schultz finding the existence of collusion in the fixing of Nasdaq spreads as support for their allegations of price fixing. Plaintiffs further assert that Defendants reintroduced oddeighths quotations as a result of adverse publicity arising from the study.

In support of their motion to include institutional investors in the Class, Plaintiffs have submitted an affidavit of Professor Michael J. Barclay demonstrating that "even large institutional investors, who sometimes were able to negotiate within the quoted spreads, likewise paid a higher price for market-making services than they would have paid in the absence of the conspiracy."

In a study of the Nasdaq market, Professor Barclay found that when securities moved from Nasdaq to the New York Stock Exchange, ("NYSE"), or American Stock Exchange, ("Amex"), effective spreads also narrowed for all trade sizes, and concluded that there is evidence that quoted bid-ask spreads create a starting point for negotiations between Nasdaq market-makers and their customers, and that increasing this starting point increases the price paid for market-

making services even in negotiated transactions.

Plaintiffs also rely on direct evidence which has been filed under seal pursuant to the confidentiality stipulation and order issued on February 21, 1996. The evidence consists of a communication from a large institutional investor and two audiotaped conversations.

### The Opinion Certifying the Class

By motion filed March 20, 1996, Plaintiffs sought certification of:

(a) a Class consisting of all persons, firms, corporations, and other entities (excluding Defendants and other Nasdaq market-makers, and their respective affiliates) who purchased or sold Class Securities on the Nasdaq National Market, trading directly (or through agents) with the Defendants or their co-conspirators, or with their respective affiliates, during the period May 1, 1989 to May 27, 1994 ("Class Period"); and

(b) a Subclass consisting of those members of the above Class who at the time of class notice are current brokerage customers of Defendants (or their affiliates), or whose brokerage accounts are cleared by the Defendants (or their affiliates), and to whom Defendants (or their affiliates) send periodic mailings.[1]

The Opinion certified the proposed class of Plaintiffs, with the following specific limitation to ensure that investors who traded through Defendants' agents, rather than through the Defendants themselves, have standing pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735, 97 S.Ct. 2061, 2069, 52 L.Ed.2d 707 (1977): the class (the "Class") "will be defined to include investors who transacted through non-Defendant owned brokers where those brokers did not function as a distinct economic entity in the chain of purchase or sale." *Nasdaq V*, 169 F.R.D. at 506. *See also Diskin v. Daily Racing Form, Inc.*, 1994–1 CCH Trade Cases ¶ 70,649, 1994 WL 330229 (S.D.N.Y. 1994).

The Court held that then-Plaintiff the State of Louisiana had "no viable claim to bring on its own behalf," and that the claims for relief asserted by Louisiana "belong to the individual retirement systems that bought or sold the securities," which systems "alone have the right to assert their claims."

Having dismissed the claims asserted by the State of Louisiana, the only institutional investor among the proposed class representatives, the Court did not address the Defendants' contention that institutional investors cannot be included in a class:

> In light of the Court's holding that the State of Louisiana may not proceed in this action on behalf of its state agencies, the named Plaintiffs do not currently include any institutional investors. Accordingly, the issue of the typicality of institutional investors' claims is not currently before the Court, and need not be addressed.

*Nasdaq V*, 169 F.R.D. at 512.

The Court held that the remainder of the proposed class met each of the requirements of Rules 23(a) and 23(b), Fed.R.Civ.P., governing class certification. The requirements of Rule 23(a) are: numerosity and impracticability; commonality; typicality; and adequacy of representation. Pursuant to Rule 23(b), a class action may be maintained where:

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief for the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Rule 23(b)(1) and (2), Fed.R.Civ.P.

The Court certified the Class under Rule 23(b)(2), holding that the continuing nature of the conspiracy alleged makes injunctive relief an important aspect of the overall relief sought. *Nasdaq V*, 169 F.R.D. at 516–17

---

1. The proposed Subclass was limited to persons      to whom the Defendants send periodic mailings.

(citing *Gelb v. American Telephone & Telegraph Co.*, 150 F.R.D. 76, 78 (S.D.N.Y.1993)).

The Court also certified the Class under Rule 23(b)(3), holding that: (i) common issues of law and fact predominate over individual issues; and (ii) the class action is superior to other methods of adjudication. *Id.*, 169 F.R.D. at 529.

Specifically, the Court found that common issues of law and fact exist with respect to:

(1) whether Defendants and their co-conspirators engaged in a combination or conspiracy to raise, fix and maintain Nasdaq spreads at supra-competitive levels;

(2) the implementation, duration and scope of Defendants' combination or conspiracy;

(3) whether each Defendant was a participant in the combination or conspiracy;

(4) whether Defendants' conduct violated Section 1 of the Sherman Act;

(5) whether Defendants took affirmative steps to conceal their combination or conspiracy;

(6) the effectiveness of Defendants' combination or conspiracy;

(7) whether Plaintiffs and the members of the Class are entitled to injunctive relief, and the appropriate contours of that relief;

(8) the appropriate measure of damages and the amount of damages suffered by the Class as a whole.

The Court found that "[s]ince a single conspiracy is alleged, the relevant proof of this will not vary among class members, and clearly presents a common question fundamental to all class members." *Nasdaq V*, 169 F.R.D. at 518.

In order to recover, each Plaintiff class member will have to prove the existence of the Defendants' conspiracy to fix spreads. Plaintiffs have stated that, as common proof of the existence of the alleged conspiracy, they intend to submit, inter alia, certain documents already produced by Defendants, including internal Nasdaq memoranda acknowledging the widening of Nasdaq spreads; academic studies, including the one by Professors Christie and Schultz, describing the widening Nasdaq spreads and the absence of odd-eighths quotations; and documents demonstrating the narrowing of the spreads following the publicity surrounding the Christie and Schultz study.

Proof of the alleged single conspiracy will also involve evidence of conspiratorial statements and conduct, including the contents of taped telephone conversations, attributable to Defendants, which will not vary among the class members. . . .

*Nasdaq V*, 169 F.R.D. at 518.

With respect to the implementation and scope of the conspiracy, the Court held that:

each Plaintiff Class member will have to prove the implementation of the Defendants' conspiracy, and the mechanisms used to enforce or police that conspiracy. The relevant proof in this area will include direct as well as economic evidence of: the effective elimination of odd-eighth quotations for Class Securities; the causal relationship between the absence of odd-eighth quotations and the increased spreads for Class Securities; and the reintroduction of odd-eighths that caused a dramatic reduction in spreads following publicity about collusion. . . .

*Id.*

The Court further held that because "liability for antitrust violations is joint and several . . . . each Class member may [ ] recover his or her full loss from any defendant who can be shown to have participated in the alleged conspiracy. . . . Every Class member therefore has an interest in establishing the liability of each Defendant. . . ." *Id.* at 519.

The determination of whether Defendants' conduct violates relevant antitrust law, as well as whether affirmative defenses are applicable, was held by the Court to be a question of law common to all Plaintiffs. *Id.*

The Court held that Plaintiffs' intended proof of the effectiveness of Defendants' conspiracy through economic theory, academic studies, data sources, and statistical techniques—all designed to demonstrate that Nasdaq spreads were actually widened as a result of the conspiracy—is proof common to the entire class. *See id.* at 520.

With respect to the Plaintiffs' entitlement to injunctive relief, the Court held that the "contours of appropriate equitable relief will be a common question of critical importance at trial." *Id.* Likewise, the Court held that the six alternative and complementary methodologies by which Plaintiffs propose to prove "the existence and measure of damages suffered by the Class" are "common to the Class, and the validity of each will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the Class." *Id.* at 521.

"In sum, proof of Defendants' conspiracy lies at the heart of this case and is common to the Class." *Id.* at 519.

*Discussion*

### I. Institutional Investors Will Be Included in the Class

■ Defendants contend that trades executed by institutional investors are significantly different from those executed by other investors, and that these differences render class action inappropriate for adjudication of the claims of both individual and institutional investors.

Defendants point to natural and other "riskless" trades as evidence that, with respect to institutional investors, individual issues predominate over common ones. Natural trades, in which an entity is found that is willing to buy the stock at the same price at which the institution sell it (or vice versa), are carried out with no risk to the broker, and the broker therefore earns a commission of only ⅙, regardless of the current inside spread on that stock.

According to Defendants, riskless trades—which must be excluded from the class [2] because they were not affected by the alleged conspiracy—could only be separated from trades carried out at risk to the market-maker on an individualized basis.

Defendants further contend that even with respect to institutional investor trades in which the market-maker incurs risk, the complex differences among such trades render them inappropriate for adjudication in a class action. First, Defendants note that institutional investors have exclusive access to information as to price, volume and future trading interest from the Instinet, an automated trading system, as well as from other sources, and that institutional investors use this information to negotiate with market-makers for their desired price and volume.

Second, Defendants state that the fact that institutional investors regularly trade in increments of 10,000 shares or more affects the price at which those investors trade. Moreover, institutional investors also base trades on volume, rather than price, and may pay a greater trading spread in order to receive the desired volume from a market-maker.

Thus, Defendants conclude that the factors that affect the price and size negotiations between institutional investors and market-makers are too varied and complex to permit a determination of the alleged conspiracy's impact on such trades, except if such trades were analyzed on an individual basis. According to Defendants, because the spread of a given stock is only one of many factors that influences the price at which institutional investors trade, individual issues predominate over common issues, and a class action is not superior to other forms of adjudication as required under Rule 23(b)(3), Fed.R.Civ.P. *See In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y.1996).

However, the Defendants have not established that the variables described are more significant than the issues common to individual and institutional investors. Plaintiffs assert that natural trades do not uniformly yield a commission of ⅙, but at times yield only ⅟₁₆. Plaintiffs further assert that this variation may be affected by the size of the current inside spread on the particular stock. Plaintiffs also point to one deponent's statement that natural trades constitute a small percentage of all the institutional investors activities. Whether or not this is accurate, these allegations, together with those described below, suggest that the Defendants

**2.** One type of riskless trades—those conducted through Instinet—has already been excluded from the class by agreement of the parties.

may be overreaching when they assert that the use of natural trades entirely refutes the existence of common proof and common questions between individual and institutional investors.

In spite of the above-described differences between individual and institutional investors, there are sufficient similarities among all Nasdaq investors such that inclusion of institutional investors in the class is warranted.

As set forth above, Plaintiffs submitted evidence in the form of an affidavit of Professor Michael J. Barclay and several economic studies, that even large institutional investors paid a higher price for market-making services than they would have paid in the absence of the conspiracy.

As Professor Barclay has stated:

The smaller bid-ask spreads that were observed when market-makers for certain Nasdaq securities began using both odd- and even-eighth quotes after the national publicity about potential collusion among Nasdaq market makers conveyed significant benefits to all customers who purchased from or sold to market makers in those securities. . . .

The Christie–Harris–Schultz study shows that when market-makers switched from avoiding odd-eighth quotes to using both odd- and even-eighth quotes for a particular Nasdaq security, the effective spread narrowed for that security in all trade-size categories. The greatest reduction in trading costs is experienced by the small retail customer buying or selling only a few hundred shares. . . . Even for the largest trades, however, (trades over 10,-000 shares) there was a significant reduction in trading costs when market-makers started quoting both odd and even eighths. The average effective spread for trades larger than 10,000 shares fell from about 23 cents to about 14 cents per share.

This comparison of effective bid-ask spreads before and after the national publicity about potential collusion among Nasdaq market-makers provides important information. . . . This conspiracy would, by necessity, impact any customer who paid the inflated spread by purchasing shares from or selling shares to a market maker at the quoted bid or ask. The Christie–Harris–Schultz analysis of effective spreads indicates that even those customers who traded in sufficient volume to negotiate a price inside the quoted bid and ask (typically large institutional customers) also paid a higher price for market-making services than they would have in the absence of the conspiracy.

Thus, Plaintiffs have appropriately alleged that even large trades were affected by the increased willingness to quote odd-eighths that resulted from adverse publicity regarding the Defendants' alleged conspiracy. Further evidence of the impact of the conspiracy on institutional traders is found in Professor Barclay's study of the Nasdaq market, in which he found that when securities moved from Nasdaq to the NYSE or Amex, effective spreads also narrowed for all trade sizes. Consistent with the results in Christie, Harris and Schultz, Barclay found that the average effective spread declined for all trade sizes when these securities moved from Nasdaq to the NYSE or Amex. Barclay thus concluded that there is evidence that quoted bid-ask spreads create a starting point for negotiations between Nasdaq market-makers and that their customers, and increasing this starting point increases the price paid for market-making services even in negotiated transactions.

Such evidence of the impact of the Defendants' conspiracy on negotiated transactions is significant because Defendants' opposition to the inclusion of the institutional investors in the Class is based in part on the contention that institutional investors' negotiated transactions are not significantly affected by the conspiratorial avoidance of odd-eighths quotes, and that even if such trades were so affected, it would be impossible to determine to what extent the conspiracy was responsible for the effect except on an individual basis.

This Court has already held that the existence of "negotiated prices" are not an "impediment" to class certification, so long as Plaintiffs demonstrate that they will be able to adduce common proof that the "price

range was affected generally." *See Nasdaq V,* 169 F.R.D. at 523. As set forth above, Plaintiffs have set forth common proof that the conspiracy to inflate quoted Nasdaq spreads did have a general effect on the transactions costs borne by institutional investors.

Discovery taken to date provides some direct evidence which supports the inference that institutional investors have been injured by the Defendant's conspiracy. This direct evidence, referred to above, was filed under seal pursuant to the February 21, 1996 confidentiality stipulation and order entered by the parties, and was submitted by the Plaintiffs in support of this motion.

In light of the Plaintiffs' allegation that institutional investors were injured by the conspiracy, supported by the evidence described above, Plaintiffs have met their burden, at this juncture, of demonstrating that institutional investors should properly be included in the class.

## II. The Systems' Claims Are Typical of Other Institutional Investors' Claims

Rule 23(a)(3) requires that the claims asserted by plaintiffs on behalf of a proposed class be typical of the claims of the other members of the class.

Typicality refers to the nature of the claim of the class representatives and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.

*Dura-Bilt Corp.,* 89 F.R.D. at 99; *see Gary Plastic Packaging Corp. v. Merrill Lynch,* 903 F.2d 176, 179 (2d Cir.1990).

■ Typicality under Rule 23 requires that a class representative "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Daniels v. Amerco,* 1983-1 Trade Cas. ¶ 65,274, 1983 WL

1794 (S.D.N.Y.1983); *National Auto Brokers Corp. v. General Motors Corp.,* 60 F.R.D. 476, 486–87 (S.D.N.Y.1973) ("the primary criterion [for determining typicality] is the forthrightness and vigor with which the representative party can be expected to assert the interests of the members of the class").

■ As set forth in this Court's class certification Opinion:

Rule 23(a)'s typicality requirement is established where, as here, the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other Class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives. . . .

Typicality, however, does *not* require that the situations of the named representatives and the class members be identical. . . . Moreover, provided that all claims arise from the same price-fixing conspiracy, factual differences among proposed Class members' claims do not defeat class certification.

*Nasdaq V,* 169 F.R.D. at 511. *See also,* 1 Newberg on Class Actions § 3.13 at 3–77 (3d ed.1992) (typicality requirement usually met "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented"); *Id.* at § 3.13 at 3–79 & n. 208 (explaining that "differences in the methods of purchase . . . among class members have been held not to bar a finding of typical claims" in price-fixing actions, and that "in class actions charging defendants with a conspiracy to fix prices, the claims of the named plaintiffs were held typical of the claims of the class members despite variations in the manner in which members of the class purchased from the defendant . . . differences in price, and other factors").

The authorities addressing typicality in price-fixing actions were summarized in the *In re Catfish Antitrust Litigation,* 826 F.Supp. 1019, 1034–37 (N.D.Miss.1993):

Certainly, typicality does not mean that the claims of class members must be iden-

tical.... Furthermore, in instances wherein it is alleged that the defendants engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical....

There has been general agreement that the existence of varying fact patterns to support the claims of individual class members does not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory.

To the extent the Systems differ among themselves, their diversity provides additional support for adequacy of representation. As held recently in the *In re Citric Acid Antitrust Litigation*, 1996–2 CCH Trade Cases ¶ 71,595 at 78,187, 1996 WL 655791 (N.D.Cal.1996):

> [T]he variety among plaintiffs with regard to frequency, continuity, recency, and mode of purchase actually contributes to their representativeness because there will likely be similar diversity among members of the class....

Defendants deposed two of the Systems' investment advisors. One testified that the trading he carried out on behalf of the Systems was "typical" of the trading he did for his clients generally. The second testified that his company has "lots of other clients" who are "similar" to the "Louisiana funds" in the amount of the money under management and in the services required; and that he traded "plain vanilla" accounts of "large net worth individual accounts" in the same way that he traded for institutional investors such as the Systems.

A practice known as "block trading" provides further support for the typicality of the Systems' trades. "Block trades" occur when orders from various institutional investors are grouped and executed together as a larger order. One advisor testified at deposition that the block trades ensured that all the advisors' clients were treated equally and given the same price for their transactions.

In the present case, the typicality requirement is satisfied because the Complaint alleges a single price-fixing conspiracy that affected both individual and institutional investors, and because the Class is limited to those investors, whether individual or institutional, who purchased securities on which odd-eighth quotations were effectively eliminated by reason of that conspiracy.

### III. *The Systems Are Adequate Representatives*

The Supreme Court has held that Plaintiffs must satisfy both prongs of a two-pronged test to qualify as adequate representatives pursuant to Rule 23(a)(4): (1) the representatives' interests must not conflict with the class members' interests, and (2) the representatives and their attorney must be able to prosecute the action vigorously. *General Tel. Co.*, 457 U.S. at 157 & n. 13, 102 S.Ct. at 2370–71 & n. 13; *Nasdaq V*, 169 F.R.D. at 512. The commonality and typicality requirements blend together in determining whether the representative Plaintiffs' claims are sufficiently typical of the classwide claims that the representatives will adequately represent the class. *General Tel. Co.*, 457 U.S. at 157 & n. 13, 102 S.Ct. at 2370–71 & n. 13; *Nasdaq V*, 169 F.R.D. at 512.

The Plaintiffs thus must show, first, that there is an absence of conflict and antagonistic interests between the proposed representatives and the class members, and second, that Plaintiffs' counsel is "qualified, experienced and capable." *Ross v. A.H. Robins Co.*, 100 F.R.D. 5, 7 (S.D.N.Y.1982); *accord In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992).

### A. *Absence of Conflict*

■ Proposed class representatives who are subject to "unique" defenses are not proper class representatives, where such defenses are both relevant and sufficient to create "antagonism" between the interests of the representative and the interests of the Class. *German v. Federal Home Loan Mortgage Corp.*, 168 F.R.D. 145, 154–55 (S.D.N.Y.1996) (holding additional plaintiffs to be "appropriate class representatives"). *See also In re Wirebound Boxes Antitrust Litigation*, 128 F.R.D. 268, 270–71 (D.Minn. 1989) (rejecting defendant's argument that proposed class representatives were subject to unique defenses, and holding that, to the

extent the "representatives' claims diverge from those of the proposed class, they do not create interests which conflict with those of the class.")

Defendants contend that the systems are not proper class representatives because they are subject to unique defenses as to whether the conspiracy caused the Systems injury, and whether the Systems suffered cognizable damages as a result of the conspiracy. In support of this contention, Defendants point to the following: first, one of the Systems' advisors testified that the Systems routinely traded in increments narrower than the quoted spread; the Nasdaq quotes were only marginally relevant in determining the prices at which the Systems traded Nasdaq securities, and those quotes were not at all relevant in determining the prices of riskless and "natural" trades; and second, the Defendants note that the Systems' advisors testified that they did not perceive a difference in their Nasdaq trading before and after the date on which the conspiracy allegedly ended.

Defendants further contend that, even assuming quoted spreads were "fixed," the Systems are subject to the defense that they suffered no damages as a result. The Systems' advisors have testified that, for so-called "natural" and riskless trades, they trade for a standard increment, regardless of the quoted spread. The Defendants further note that the Systems' advisors are able to, and routinely do, negotiate price. The Systems also have access to proprietary systems, such as Instinet, that advertise the availability of, or demand for, stock at given prices, or permit trading with market-makers or directly with other institutions.

On this basis, Defendants contend that the Systems are subject to a unique defense that renders them unqualified to serve as class representatives, i.e., that regardless of the existence of the conspiracy to avoid odd-eighth quotations and thereby to widen spreads, competition among market-makers for institutional order flow was not diminished, and institutions routinely traded on competitive terms unavailable to Class members generally.

In granting Plaintiffs' motion for class certification, however, this Court held that each individual Plaintiff has an incentive to demonstrate the existence of Defendants' conspiracy, its illegality, and each Defendant's participation in that conspiracy. *See Nasdaq V*, 169 F.R.D. at 513. The issues which this Court has held are central to this case—the existence and illegality of Defendants' conspiracy to inflate the spreads—are common to institutional and individual investors alike. Because the Systems share common claims with the already named Plaintiffs, there is "no fundamental conflict between the claims" of the Systems and the claims of the current class members. *See German*, 168 F.R.D. at 153 (citing *German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 555 (S.D.N.Y.1995)).

### B. *Qualification of Counsel*

With respect to the qualification of counsel, this Court has determined that:

> The attorneys seeking to represent the class in this case include some of the most experienced lawyers in the United States in the prosecution of antitrust and securities class actions. The firms representing Plaintiffs have represented that they are ready, willing and able to devote the resources necessary to litigate this case vigorously. Accordingly, this prong is satisfied.

*Nasdaq V*, 169 F.R.D. at 515.

There can be no question that class counsel are as well as qualified to represent institutional investors in this action as they are to represent individual investors.

### IV. *Including Institutional Investors in the Class Will Facilitate a Determination of Aggregate Damages at Trial*

This Court already has held that damages may be determined classwide, on an aggregate basis, and that "[t]he aggregate class damage approach has obvious case management advantages":

> Due to the nature of the Nasdaq market and the availability of computerized data, the aggregate damages of the Class as a whole may be susceptible to determination

in a single trial along with the issue of liability. Indeed, as a result of the computerized databases of the NASD, and of Defendants themselves, the data relevant to aggregate damages here may be susceptible to being assembled and organized in a relatively straightforward manner. . . .

The aggregate class damage approach has obvious case management advantages. By eliminating individual damage proofs at trial, the length, complexity and attendant costs of litigation are greatly reduced . . .

*Nasdaq V,* 169 F.R.D. at 524–25.

Plaintiffs have submitted evidence that inclusion of institutional investors in the Class will facilitate a determination of aggregate damages. According to Plaintiffs, exclusion of institutional investors would complicate the determination of aggregate damages because it would require the specific definition of "institutional investors", the determination of the volume of trading by institutional investors, the determination of the damages attributable to those trades, and the reduction of aggregate damages by that amount.

Professor Barclay has stated that if institutional investors were excluded from the Class, it would no longer be possible to apply a single measure of damages to the aggregate trading volume in Class Securities in order to arrive at aggregate damages for the Class as a whole. Instead, in order to segregate and remove institutional volume, it might be necessary to develop a new database, which would require substantial data from the Defendants' own records or other sources to identify the parties to individual securities transactions. Defendants seek a definition of "institutional investor" that would include all businesses and natural persons with "total assets of at least $50 million", which might often be difficult, if not impossible, to ascertain from Defendants' own records. Once the institutional trading volume was identified, additional calculations would be necessary to determine the damages attributable to this volume in order to reduce the aggregate damages by this amount.

## V. *Certifying the Entire Class Will Facilitate the Efficient Resolution of this Litigation*

The question of whether "potential class members have both the incentive and [the] capability to pursue claims individually without the benefit of a class action" is central to the superiority requirement of Rule 23(b)(3). *Zimmerman v. Thomson McKinnon Sec., Inc.,* No. 88 Civ. 8019(LBS), 1989 WL 122742, at *1 (S.D.N.Y. Oct. 11, 1989) (denying class certification). Defendants contend that institutional investors have both the "incentive" to pursue any claims and the "capability" to do so on an individual basis.

The volumes in which institutional investors generally transact do indicate a sufficient economic incentive on the part of injured institutional investors to bring an individual claim. *Cf. Steinmetz v. Bache & Co., Inc.,* 71 F.R.D. 202, 205 (S.D.N.Y. 1976) (denying class certification where potential claims for $5,000 were sufficiently large to create incentive to sue individually); *Stoudt v. E.F. Hutton & Co., Inc.,* 121 F.R.D. 36, 38 (S.D.N.Y.1988) (denying certification and concluding that named plaintiff was likely to assert individual claim with a value of "at least $60,000").

Likewise, relative to individual investors, institutional investors would generally be capable of commencing individual actions, particularly because Defendants seek to exclude from the Class only entities assets of at least $50 million.

This Court, however, has already held that "[m]ultiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims. . . ." *Nasdaq V,* 169 F.R.D. at 527. Moreover, "class certification here would partially equalize the bargaining power between Plaintiffs as a group and Defendants as a group, and thus improve the chances of an equitable settlement." *Id.* at 528.

If institutional investors were excluded from the Class, a multitude of individual suits would likely be filed. The inefficiency of such a result was described in *State of Illi-*

**130**

*nois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484, 490 (N.D.Ill.1969):

> The recent history of this litigation dramatically illustrates the impracticality of these alternatives [to class certification]. In 1966 there was a single suit purporting to be a class action. The entire litigation might have been concluded without further complexity. But defendants successfully opposed the class suit, with the result that lawsuits have blossomed throughout the country. Rather than the original handful of attorneys, lawyers are now so plentiful that the entire courtroom is filled at each pretrial conference.

As this Court already has noted, " 'the threat of inundation comes from the prospect of individual, duplicative actions rather than from a class action." *Nasdaq V*, 169 F.R.D. at 528 (citing *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 38 (S.D.N.Y.1977), *app. dism'd*, 574 F.2d 656 (2d Cir.1978)).

Moreover, although institutional investors, when compared to individual investors, may appear perfectly capable of seeking redress individually, smaller institutional investors may not be willing and able to hire counsel to battle against the collective resources of the nation's largest financial industry firms. In *duPont Glore Forgan, Inc. v. American Telephone & Telegraph Co.*, 69 F.R.D. 481, 487 (S.D.N.Y.1975), the Honorable Edward Weinfeld addressed this issue as follows:

> Monsanto, itself no corporate pigmy, would not, without class action determination, prosecute its claim, which amounts to $130,000.... [W]hile Monsanto was willing to continue to pay disbursements which, to date, have been substantial, the time-cost factor of legal fees in view of the vigor of defendants' opposition, made it uneconomical to proceed with the suit on an individual basis even assuming an ultimate recovery—in fact, Monsanto would, if required to proceed on an individual basis, forego its claim....

Judge Weinfeld's reasoning applies with even greater force to the thousands of smaller institutional investors here, who are faced with the prospect of litigating against not just one corporate entity, but many.

Thus, the prospect of individual lawsuits brought by hundreds of institutional investors looms, while smaller institutional investors could be forced to choose between foregoing their claims against the Defendants or incurring the cost of individual litigation. Such an outcome would undermine the goals of efficiency and fairness set forth in Rule 23(b)(3), Fed.R.Civ.P.

Finally, inclusion of institutional investors, who execute nearly 70% of all trades, will significantly improve the prospects for an overall resolution of the issues raised by this litigation. Whether or not the formation of a subclass of institutional investors would assist in such a resolution is an issue to be left for another day. *See* 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1790 at 270 (2d ed. 1986) ("The process of ... dividing the class into suitable units may be undertaken at any time and the desirability of doing so should be re-evaluated throughout the litigation."); 1 Newberg *supra* § 3.31 at 3–154 (court may avoid potential conflict regarding nature of relief by creating subclasses).

### Conclusion

For the reasons set forth above, Plaintiffs' motion to include institutional investors in the Class and to certify the Systems as class representatives is hereby granted.

It is so ordered.