## In re BLECH SECURITIES LITIGATION.

### No. 94 Civ. 7696(RWS).

United States District Court, S.D. New York.

May 11, 1999.

---

Zwerling, Schachter & Zwerling by Robert S. Schachter (Esther Berkowitz–Caballero, of counsel), New York City, for plaintiffs.

Cadwalader, Wickersham & Taft by Dennis J. Block, Michael G. Dolan (Suzanne J. Romajas, of counsel), New York City, for Bear, Stearns Co., Inc.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione (Jeffrey P. Flynn, of counsel), Newark, NJ, for Baird Patrick & Co.

## OPINION

SWEET, District Judge.

The plaintiffs in these consolidated actions alleging securities and common law fraud have moved for certification of a class pursuant to Rules 23(a) and 23(b)3, Fed.R.Civ.P. The motion has been opposed by defendants Bear Stearns & Co., Inc. ("Bear Stearns") and Baird Patrick & Co. ("Baird Patrick"). The motion is granted, and classes will be certified in accordance with the conclusions set forth below.

### The Parties

Each of the seventeen named plaintiffs in these actions (the "Plaintiffs") purchased securities of certain of twenty-two biotechnology companies in either the primary or secondary market (the "Blech Securities"),[1] which it is alleged were manipulated and affected by the activities of defendants Blech & Co. ("Blech & Co."), David Blech ("Blech"), and others from July 1, 1991 to September 21, 1994 (the "Class Period"). The Plaintiffs seek certification to bring this action on behalf of a class of persons similarly situated.

Defendant Bear Stearns is an investment banking and securities trading and brokerage firm organized and existing under the laws of Delaware with its principal place of business in Manhattan. Bear Stearns is registered with the Securities and Exchange Commission (the "SEC") and is a member of the National Association of Securities Dealers ("NASD"). Bear Stearns acted as Blech & Co.'s clearing agent for all securities transactions involving Blech & Co. from September 1993 through the end of the relevant Class Period.

Defendant Baird Patrick is a registered broker-dealer with its principal place of business in Manhattan. Baird Patrick is registered with the SEC and is a member of the NASD. During the period of time relevant to this action, Baird Patrick was a market-maker for certain of the Blech Securities.

Defendant Blech, a resident of New York, was at all times material to this action managing director and sole shareholder of Blech & Co.

Blech & Co., a New York corporation with its principal place of business in Manhattan, was a registered broker-dealer. During the period relevant to this case, Blech & Co. acted as an underwriter or market-maker or both for numerous companies, primarily in the biotechnology field. Blech & Co. ceased operations on September 22, 1994, having failed to maintain minimum capital requirements. At that time, Blech & Co. was the principal market-maker for the Blech Securities and had about six thousand customer accounts in offices in New York, Boston, Atlanta, and Boca Raton, Florida.

Defendant Mark S. Germain ("Germain") was at all material times a Managing Director of Blech & Co. Germain served on the board of directors of ASI, Ecogen, Microprobe, Neoprobe, LXR, NeoRx, Pharmos, and Genemedicine, companies that have been named as issuer defendants and whose stocks were Blech Securities.

Defendant Chancellor Capital Management, Inc. ("Chancellor") is a corporation with its principal place of business in Manhattan. It has been registered with the SEC as an investment advisor since 1973. Chancellor's investment management activities on behalf of its managed accounts are conducted by four business units, one of which is the Alternative Asset Management Group ("AAMG"). Defendant Parag Saxena ("Saxena") was a managing director of Chancellor and a member of the AAMG.

---

1.  The term "Blech Securities" refers to the securities of the following companies: Advanced Surgical, Inc.; Ariad Pharmaceuticals Corp.; Ecogen, Inc.; Genemedicine, Inc.; Intelligent Surgical Lasers, Inc.; Microprobe Corp.; Neoprobe Corp.; Pharmos Corp.; LXR Biotechnology Inc.; Texas Biotechnology Corp.; NeoRx Corp.; BioSepra, Inc.; Envirogen Corp.; ICOS Corp.; HemaSure, Inc.; Liposome Technology Inc.; LaJolla Pharmaceutical Co.; Neurogen Corp.; Procept Inc.; Chemex Pharmaceuticals Inc.; Guilford Pharmaceuticals Inc.; and DNA Plant Technology Inc.

### Prior Proceedings

The prior proceedings in this action are set forth in the prior opinions of this court, familiarity with which is assumed. *See In re Blech Securities Litigation,* 928 F.Supp. 1279 (S.D.N.Y.1996) (*"Blech I"*); *In re Blech Securities Litigation,* 1997 WL 20833 (S.D.N.Y. January 21, 1997) (*"Blech II"*); *In re Blech Securities Litigation,* 961 F.Supp. 569 (S.D.N.Y.1997) (*"Blech III"*).

This litigation was originally commenced as four separate actions filed on or about October 21, 1994 against Blech & Co., Blech and various other defendants, alleging violations of the Racketeer Influenced And Corrupt Practices Act ("RICO"), Section 10(b) of the Securities Exchange Act of 1934, and common law fraud and deceit. By order dated December 12, 1994, the four actions were consolidated and on March 27, 1995, plaintiff filed an Amended Consolidated Class Action Complaint. On June 6, 1996, the Court granted Bear Stearns' motion to dismiss the claims asserted as to Bear Stearns, and all claims arising from events before October 21, 1991, were dismissed as time-barred. *See Blech I.* Therefore, Plaintiffs' proposed class period cannot start at July 1, 1991. Hereinafter, the term "proposed class period" will refer to the period October 21, 1991 through September 21, 1994.

On July 26, 1996, Plaintiffs filed a Second Amended Consolidated Class Action Complaint (the "Complaint") against defendants Blech & Co., Blech, Germain, Nicholas Madonia, Bear Stearns, Baird Patrick, Chancellor and Saxena, alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b–5 thereunder, and alleging that during the period of July 1, 1991 through September 21, 1994, defendant Blech & Co. conspired with other individuals and corporate defendants to manipulate and inflate the prices of the Blech Securities, securities issued by twenty-four different biotechnology companies. Plaintiff's Section 10(b) claim is asserted against Bear Stearns "for the period during which [Bear Stearns] was Blech & Co.'s clearing agent" (Compl.¶ 99)— *i.e.,* from September 27, 1993 through September 21, 1994.

On April 1, 1997, motions to dismiss the Second Amended Complaint were granted in part and denied in part in *Blech III.*

Discovery has proceeded under various orders and agreements. The instant motion for class certification was filed on October 2, 1998, and by agreement between the parties was heard and deemed submitted on February 17, 1999. The most recent letter submission was made on April 19, 1999.

### The Requested Class

The Plaintiffs seek certification of this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Fed.R.Civ.P. on behalf of a class of persons who purchased Blech Securities during the Class Period and were damaged thereby, excepting any person who purchased Blech Securities pursuant to private placements or any other transaction not on a public offering or on the public market. (Compl.¶¶ 1, 43.) The Complaint alleges that during the Class Period as a result of defendants' unlawful scheme and conduct in violation of the antifraud provisions of the securities laws, as well as the common law of fraud and deceit (Compl.¶ 1), Plaintiffs and the other members of Class purchased Blech Securities at prices that were artificially manipulated, inflated and maintained by the defendants.

### The Facts

■ For purposes of deciding a Rule 23 motion for class certification, the allegations set forth in the complaint are accepted as true. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978); *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 632–33 (2d Cir.1967); *In re NASDAQ Market–Makers Antitrust Litig.,* 172 F.R.D. 119 (S.D.N.Y.1997). Accordingly, the factual allegations considered here and set forth below are taken from the Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion.

The Complaint alleges that the Plaintiffs, who purchased Blech Securities at artificially inflated prices during the Class Period, suffered damages when the entire scheme collapsed on September 22, 1994, uniformly

dropping Blech Securities prices to levels which would have prevailed in the absence of the manipulative scheme.

The scheme is alleged to have been effected through a variety of deceptive devices, including sham transactions in which trades, which were reported on the NASDAQ system, took place at prearranged times and prices. Certain of these purchases were made with the understanding that the same securities would be resold by the purchaser back to the seller or to another participant in the scheme. Other trades were arranged whereby Blech would supply the funds to the purchaser to be used to pay for the purchase. In still others, Blech securities would be placed into accounts under Blech's control without the knowledge or authorization of the account holders. The manipulative scheme was also carried out by the gifting or sale of securities at nominal prices to fund managers with the understanding that they would cause their funds to purchase Blech Securities in the various offerings.

A number of charitable remainder trusts were settled by Blech (the "Blech Trusts"), and it is alleged that Blech is the income beneficiary of all of the trusts which were controlled by Blech who caused the trusts to purchase Blech Securities and to engage in sham transactions designed to artificially inflate and maintain the price of Blech Securities. Compl. ¶ 36. Blech supplied and caused the Blech Trusts, or accounts under Blech's control, to wire into the accounts of these individuals cash or securities to fill margin requirements to complete the sham purchase. Compl. ¶ 66.

Blech would allegedly direct individuals to purchase securities at just about the composite bid price from Blech & Co. or Baird Patrick. Thereafter, Blech (or Baird Patrick) would then repurchase the securities for settlement, sometimes using the Blech Trusts, so that the individuals directed to purchase the securities could pay for those securities on the settlement date with money received from the repurchase by Blech & Co. or Baird Patrick. Compl. ¶ 68.

The Blech Trusts also allegedly acted as convenient locations for Blech and Blech & Co. to "park" hundreds of thousands of shares of inflated Blech Securities by causing the Blech Trusts to buy those securities in transactions which were not *bona fide*, but undertaken with the understanding that the securities would be "sold" or the purchase transactions would be cancelled before the Blech Trusts would be required to pay. This conduct allegedly enabled Blech & Co. to give the appearance that it had met its net capital requirements, and served to inflate and maintain the price of Blech Securities. Compl. ¶ 71.

The Blech Trusts also allegedly transferred trust property directly to Blech for his own personal use and allowed certain lending institutions to use trust property as collateral for loans made personally to Blech. The Complaint provides two examples of such transactions, both of which involved Madonia's Trusts. Compl. ¶ 72.

Plaintiffs also allege that during the period from September 1993 through September 1994, Bear Stearns acted as a direct participant in the alleged manipulative scheme.

During the summer of 1994, Bear Stearns allegedly demanded that Blech & Co. sell Blech Securities in order to reduce its debt in margin accounts at Bear Stearns. Bear Stearns is alleged to have known that the market prices of Blech Securities had to be maintained at artificially inflated levels in order for Blech to liquidate sufficient amounts of those securities to eliminate the debit balance outstanding at Bear Stearns and thereby eliminate Bear Stearns' own exposure to the risk of incurring losses. The Complaint alleges that Bear Stearns knowingly executed manipulative sham transactions between Blech and his affiliates and confederates. Compl. ¶ 38.

Plaintiffs contend that Bear Stearns was motivated to inflate the market prices for Blech Securities by its desire to decrease its own risk of loss due to Blech's mounting leverage and over concentration in small, illiquid biotechnology securities, many of which were classified by Bear Stearns as not acceptable as collateral due to their illiquidity and inflated price levels. Compl. ¶ 74.

Bear Stearns allegedly knew that the market prices of Blech Securities had to be main-

tained at artificially high levels n order for Blech to liquidate sufficient amounts of Blech Securities, thereby eliminating the debit balances outstanding in his accounts at Bear Stearns. Compl. ¶ 76. The details of the Complaint against Bear Stearns are described in greater detail in *Blech III.*

Baird Patrick is also alleged to have been a direct participant in the manipulative scheme as alleged for the entire Class Period by participating in numerous sham transactions involving Blech Securities. These sham transactions involved millions of dollars of Blech Securities in arranged sales and "round trip" sales between all defendants. Compl. ¶ 58.

Baird Patrick's role as a market-maker for numerous Blech Securities during the Class Period is alleged to have made it a direct participant in the scheme as well. Compl. ¶ 32. The Complaint alleges that Blech directly instructed "one or more of his confederates to use brokerage accounts at major brokerage firms and through specific accounts to place a bid for a specific number of shares or units of one or more of the Blech Securities for which Baird Patrick was a market maker, at just about the composite bid price." Compl. ¶ 67. As one of the only significant market makers for the Blech Securities, Baird Patrick was virtually guaranteed to be a seller of the securities. Compl. ¶ 68. Approximately four days later, Baird Patrick would repurchase the securities for settlement the next day, so that the individuals purchasing the securities at just about the composite bid price could pay for those securities on the settlement date with money received from the repurchase by Baird Patrick. Compl. ¶ 68. Baird Patrick is alleged to have been therefore a direct participant in the single scheme of market manipulation and to have operated as Blech's "alter ego." Compl. ¶ 69. When certain sham transactions were being "D.K.'d" because the "purchaser" did not have sufficient capital to complete the trade, Baird Patrick representatives were informed by the purchaser that Blech had failed to supply enough money to complete the transaction. Compl. ¶ 69. Blech would then call the purchaser and agree to wire more funds.

The Complaint alleges approximately ten percent of the illegal sham transactions in this part of the fraudulent scheme were effectuated through Baird Patrick, amounting to millions of dollars, Compl. ¶ 69, and that Baird Patrick received substantial income from participating in these sham transactions. Compl. ¶ 69.

### The Application of Rule 23

Rule 23(c)(1), Fed.R.Civ.P., provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained." *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 94 (S.D.N.Y.1981). The only question to be determined at this stage is whether the requirements of Rule 23 have been satisfied. Furthermore, the Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation, *see Korn v. Franchard Corp.,* 456 F.2d 1206, 1208–09 (2d Cir.1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298, 301 (2d Cir.1968).

■ Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws. It is well recognized that private enforcement of these laws is a necessary supplement to government regulation. *See Green,* 406 F.2d at 296, 299. Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir. 1985).

■ However, courts may certify a class action only after undertaking "rigorous analysis" to assure that the requirements of the rule are satisfied. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

### The Requirements of Rule 23(a)

Rule 23(a) provides that:

[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If these four criteria are not met, an action may not be maintained as a class action. Fed.R.Civ.P. Rule 23(b) Each of these criteria is considered in turn below.

### Numerosity and Impracticability

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Impracticability means difficulty or inconvenience of joinder; the rule does not require impossibility of joinder. *Northwestern National Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 511 (S.D.N.Y. 1984); *Goldstein v. North Jersey Trust Company*, 39 F.R.D. 363, 367 (S.D.N.Y.1966).

■ Although the exact number of class members is not set forth by the Plaintiffs, it is alleged that the number of class members is in the thousands. Shares of Blech Securities were actively traded during the Class Period, primarily on the NASDAQ National Market System. In addition, names and addresses of the Class members can be ascertained from the books and records of defendants, their agents and other sources, including the issuers of Blech Securities and their transfer agents. Consequently, numerosity is not a hotly contested issue. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992) (noting, with respect to a class of 850 claimants, that the class was "clearly so numerous that joinder is impracticable"), *cert. dismissed sub. nom., Hart Holding Co. v. Drexel Burnham Lambert Group, Inc.*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *Beckerman v. Sands*, 364 F.Supp. 1197 (S.D.N.Y.1973) (150 prospective class members satisfied numerosity requirement); *Eisenberg*, 766 F.2d at 785–86 ("[t]he allegation of more than 90 geographically dis-

persed plaintiffs met the numerosity requirement of Fed.R.Civ.P. 23(a)(1)").

Courts in this Circuit have routinely held that classes far smaller than the one proposed here are sufficiently numerous for class certification. *See, e.g., Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir.1972) (certifying class which may be limited to 70 or 212 investors); *McNeill v. New York City Housing Authority*, 719 F.Supp. 233, 252 (1989) (1,059 Section 8 tenants whose subsidies were suspended or terminated); *Fidelis Corp. v. Litton Industries, Inc.*, 293 F.Supp. 164, 170 (S.D.N.Y.1968) (certifying class of 35–70 individuals).

■ As this Court noted in *In re NASDAQ*, 169 F.R.D. at 509, and in *German*, 885 F.Supp. at 552, "[p]recise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity." *Accord, Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 55 (S.D.N.Y.1993); *Ellender v. Schweiker*, 550 F.Supp. 1348, 1359 (S.D.N.Y.1982), *appl. dism'd*, 781 F.2d 314 (2d Cir.1986). The Plaintiffs may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class. *See McNeill*, 719 F.Supp. at 252.

Here, as in *McNeill*, more precise information as to the numbers of persons affected is within Defendants' control, but "there is something within the record from which it can be inferred that a class does exist," and "a rough estimate could be made." *Clarkson v. Coughlin*, 783 F.Supp. 789, 798 (S.D.N.Y. 1992).

In sum,

there is no magic minimum number that breathes life into a class, *see Bruce v. Christian*, 113 F.R.D. 554, 556 (S.D.N.Y. 1986), and lack of knowledge of the exact number of persons affected is not a bar to certification where the Defendants alone have access to such data, *see McNeill v. New York City Housing Authority*, 719 F.Supp. 233, 252 (S.D.N.Y.1989); *Folsom v. Blum*, 87 F.R.D. 443, 445 (S.D.N.Y.1980)

. . .

*Clarkson*, 783 F.Supp. at 798.

The number of Plaintiffs who have bought or sold Class Securities during the Class

Period meets the numerosity requirement of Rule 23(a)(1).

### Commonality

Rule 23(a)(2) requires that for an action to be maintained as a class action, there must be common issues of law and fact and law, and here lies the battleground between the parties. On the one hand, the Plaintiffs claim the existence of a single unlawful scheme, obviously with Blech at its center, in which all the defendants participated to manipulate and inflate the price of Blech Securities artificially. According to Bear Stearns, there were two "factually and legally distinct" manipulation schemes, one involving the so-called "gifting" scheme, before Blech Co. underwrote public offerings or engaged in the retail brokerage business, and the other regarding manipulative devices, unauthorized trades and sham transactions affecting the secondary market after May 1993 when Blech & Co. became a full-service broker-dealer. Baird Patrick goes further in its opposition claiming that a separate manipulative scheme is alleged affecting the securities of each of the twenty-two companies at issue.[2] In a sense, all parties are correct, since it depends upon whether the viewpoint is that of the wheel of the entire scheme, its spokes, or its hub and the time period during which the wheel is turning in a particular direction.

■ The commonality requirement of Rule 23(a)(2) has been applied permissively by courts in the context of securities fraud litigation. *See e.g., In re Technical Equities Fed. Secs. Litig.,* [1988–89 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,093, 1988 WL 147607 (N.D.Cal. Oct. 3, 1988) (in fraud on the market action involving offerings which were part of "a rather unusual investment scheme," the commonality requirement was met despite the different circumstances under which investors purchased the offerings); *In re Crazy Eddie Sec. Litig.,* 135 F.R.D. 39, 41 (E.D.N.Y.1991); *In re LILCO Sec. Litig.,* 111 F.R.D. 663 (E.D.N.Y.1986); *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). Commonality is not defeated by slight differences in class members' positions or because

"all of the allegations do not fit together like pieces in a jigsaw puzzle." *Green,* 406 F.2d at 300. In determining whether plaintiffs satisfy Rule 23(a)(2), the court must refrain from considering the merits of substantive claims. *Eisen,* 417 U.S. at 177–78, 94 S.Ct. 2140. The court is limited to verifying the existence of common questions of law and fact.

The issue of commonality can also be dealt with in terms of the questions of proof, case management and practical trial administration. In cases such as this, involving discrete but related claims, courts have designated subclasses pursuant to Fed.R.Civ.P. 23(c)(4). *See e.g., Ohman v. Kahn,* [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,359, 1990 WL 97756 (S.D.N.Y. June 27, 1990) (subclasses created where plaintiffs alleged a fraudulent investment scheme that occurred in two distinct phases); *In re Laser Arms Corp. Secs. Litig.,* 794 F.Supp. 475, 497 (S.D.N.Y.1989), *aff'd,* 969 F.2d 15 (2d Cir. 1992) (subclass created at plaintiff's request for each defendant market-maker alleged to have violated § 12(1) to insure that class members' claims go only to market-maker from whom they purchased); *Klein v. A.G. Becker Paribas Inc.,* 109 F.R.D. 646, 653 (S.D.N.Y.1986) (creating a class of 10(b) claimants for plaintiffs who traded in secondary market at inflated prices before misrepresentation cured, and subclass of § 11 claimants who purchased in public offering based on misrepresentation in prospectus); *see also In re Technical Equities Fed.Secs.Litig.,* [1988–89 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,093, 1988 WL 147607.

■ The power of the district court to designate subclasses is a broad one. *See Levine v. American Export Industries, Inc.,* [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) 95,412, 1976 WL 753 (S.D.N.Y. Jan. 8, 1976) (*citing Nix v. Machinists and Aerospace Workers,* 479 F.2d 382 (5th Cir.1973)). "Subclasses are appropriate where, such as here, unmanageability at trial would otherwise result. When one lawsuit presents dif-

---

**2.** The motion for certification seeks a class covering only twenty-two of the initial twenty-four companies and does not address the securities of MiniStor Peripherals or New Vision Technology.

ferent questions regarding the liability of various defendants for different acts committed during different time periods, sub-class treatment has been considered appropriate." *Levine*, at ¶ 99, 093.

■ In the present action, although a single overall scheme did exist, the proof of the scheme will relate to different methods and different periods. Bear Stearns, for example, does not have any alleged or demonstrated participation in the overall scheme of price manipulation until it became a market-maker in September 1993. Baird Patrick's alleged or demonstrated participation concerns the period during which it was a market-maker. No interrelationship is alleged between the manipulations of primary market and that of the secondary market.

The conclusion is thus reached that while there was a common scheme permitting class certification, in order to order the proof and manage the litigation and in fairness to the defendants, three subclasses should be created involving (1) the securities in the primary market, (2) those in the secondary market which in turn should have a subclass covering the period from September 27, 1993 (the date when Bear Stearns became a market-maker of Blech Securities).[3]

### Typicality

Under Rule 23, typicality requires that a "class representative 'have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'" *In re NASDAQ*, 172 F.R.D. 119, 126 (S.D.N.Y.1997) *quoting Daniels v. Amerco*, 1983–1 Trade Cas. (CCH) 65,274 (S.D.N.Y. March 10, 1983).[4]

As previously stated, the typicality requirement of Rule 23(a):

> is established where, as here, the claims of the representative Plaintiffs arise from the same course of conduct that gives rise to the claims of the other Class members, where the claims are based on the same legal theory, and where the class members have allegedly been injured by the same course of conduct as that which allegedly injured the proposed representatives.[5]

*In re NASDAQ*, 172 F.R.D. at 126–27 (citations omitted).

"Typicality, however, does not require that the situations of the named representatives and the class members be identical." *Id.*

■ The Plaintiffs' claims more than satisfy the typicality requirement because they arise "from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 291.

In *Tedesco v. Mishkin*, 689 F.Supp. 1327 (S.D.N.Y.1988), the plaintiffs moved to certify a class of all persons who had invested in fifteen trust fund interests, although plaintiffs themselves had only invested in eight. The court found that plaintiffs satisfied the typicality requirement and stated that:

> In aggregate, the named plaintiffs invested in many of the investment vehicles through which the alleged fraudulent scheme was conducted. More importantly, to satisfy the typicality requirement, it is not necessary for the named plaintiffs to have invested in all of the investment vehicles.... The supplemental amended complaint al-

---

3. There appears to be a dispute as to the date on which Bear Stearns' involvement in the alleged scheme began. "Proof of [this] sort is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate." *Basic Incorporated v. Levinson*, 485 U.S. 224, 249 n. 29, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citations omitted).

4. *See National Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, 486–87 (S.D.N.Y.1973) ("the primary criterion [for determining typicality] is the forthrightness and vigor with which the representative party can be expected to assert the interests of the members of the class").

5. *See, e.g., In re Drexel Burnham Lambert Group*, 960 F.2d at 291 (2d Cir.1992); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir.1986); *German*, 885 F.Supp. at 554–55; *Maywalt*, 147 F.R.D. at 57; *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y.1992) *Dura–Bilt*, 89 F.R.D. at 99; *see also* 1 Newberg on Class Actions, § 3.13 at 3–77 (3d ed.1992) (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiffs and the class sought to be represented").

leges a single pattern of fraud. The named plaintiffs' claims arise out of that scheme, which also gives rise to claims of the other class members. Further, the claims of the named plaintiffs and the class members are based on identical legal theories.... Thus the claims of the named plaintiffs are typical of the claims of the other class members.

*Id.* at 1335–36 (citations omitted) *See, e.g., In re Sumitomo Copper Litig.,* 96 Civ. 4584, 1998 U.S.Dist. LEXIS 14634, at *26 (S.D.N.Y. Sept. 18, 1998) (typicality satisfied despite the fact that class members may have purchased and sold copper futures at different times for different purposes); *In re NASDAQ,* 169 F.R.D. at 511–12 (the mere fact that the class representative did not purchase from all defendants does not determine that its claim lacks typicality under Rule 23(a)); *Maywalt,* 147 F.R.D. at 56–57 (class certified despite plaintiff investing in only three of five limited partnerships).[6]

Defendant Baird Patrick cites *Dura–Bilt Corp.,* 89 F.R.D. 87, in support of its opposition. However, in *Dura–Bilt,* the Court in fact certified the class as defined by the plaintiffs, notwithstanding the defendants' argument that the typicality requirement was not met.

Here, the typicality requirement is satisfied because, as set forth in the Complaint, the Plaintiffs' claims of fraud arise from the same course of conduct, namely, a scheme to manipulate the price of Blech Securities, and are premised on the same legal basis which is the metaphorical linchpin of the Complaint.[7] The legal theories asserted by the Class to prove violations of the federal securities laws will be identical regardless of which of the Blech Securities is at issue.

### Adequacy of Representation

The Plaintiffs satisfy Rule 23(a)(4), which requires that class representatives be adequately representative of the class. *In re NASDAQ,* 172 F.R.D. at 127, since (i) the representative's interests do not conflict with the class members' interests; and (ii) the representatives and their attorney are able to prosecute the action vigorously.

Given the materials submitted by the Plaintiffs concerning their counsel, their reputation, and the Court's experience with certain of the firms, there is no serious issue raised as to the diligence and capacity of the prosecution.

However, at this juncture it is not certain whether each of the three subclasses delineated by this Court is comprised of any of the seventeen named Plaintiffs. Thus, the class is conditionally certified on the assumption that of the seventeen Plaintiffs, some are members of each subclass. Defendants are granted leave to move to strike any or all of the subclasses on the basis of inadequate representation.

The only remaining question relates to three of the class representatives and an effort to limit the adequacy of the representation to particular securities.

However, the Plaintiffs have an interest in proving that all defendants engaged in a manipulative scheme to inflate the price of Blech Securities artificially, without respect to which ones they purchased. Defendants have not demonstrated that "any asserted 'conflict' is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *In re NASDAQ,* 169 F.R.D. at 514–15. In addition, Plaintiffs have purchased all but two of the Blech Securities.

---

6. *See also Roberts v. Heim,* 670 F.Supp. 1466, 1490–91 (N.D.Cal.1987) (investors in four partnerships certified to represent class of investors who invested in forty partnerships); *Mathews v. Kidder Peabody & Co.,* Civ. No. 95–85, 1996 WL 665729, *4 (W.D.Pa. Sept. 26, 1996) (plaintiffs who invested in different funds deemed to be typical in light of their allegations that defendants engaged in a scheme to defraud and a common course of fraudulent conduct); *Olesen v. Union Bank,* [1976–77 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 95,927 (S.D.Cal. March 31, 1976) (investors in fifteen limited partnerships certified to represent class of investors who invested in 100 limited partnerships).

7. *See E.g., Krome v. Merrill Lynch & Co., Inc.,* 637 F.Supp. 910, 921 (S.D.N.Y.1986) (plaintiffs satisfied the typicality requirement where named plaintiffs and members of the proposed class alleged fraud and impropriety on the part of defendants and presented the same evidence to support their claims).

Bear Stearns has asserted that Plaintiffs Abraham Garfinkel, Raizy Levitin, and Edward Mehfar cannot adequately represent the Class because they have not verified making a trade in the Blech Securities during the Class Period. However, at this juncture the allegations in the Complaint must be accepted as true on a motion for class certification. *In re NASDAQ*, 169 F.R.D. at 504. Bear Stearns is granted leave to move to dismiss the three challenged Plaintiffs on the grounds of failure to establish their class membership.

### Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), an action must satisfy at least one of the three conditions of subdivision (b) of Rule 23. Plaintiffs request that the Court certify a class pursuant to Rule 23(b)(3) which provides that:

> (b)(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class. Indeed, "[w]hen determining whether common questions predominate courts focus on the liability issue ... and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 52 (S.D.N.Y.1987) (*quoting Dura-Bilt*, 89 F.R.D. at 93). *See also Crazy Eddie*, 135 F.R.D. at 41 ("[P]laintiffs assert claims which raise the same common and predominating issue of defendants' liability").

As set forth above, as a result of the allegations relating to the common course of conduct alleged in this action, certain common questions of law and fact relating to liability exist as to all members of the Class and predominate over any questions affecting solely individual members. The Complaint alleges that defendants engaged in a scheme to defraud by manipulating and inflating the prices at which Blech Securities were sold to the investing public. Such conduct constitutes a "common course of conduct." *See Green*, 406 F.2d at 300. Thus, even if each Class member were to bring an individual action, each would be required to prove the existence of the alleged activities of the defendants in order to prove liability. Accordingly, Plaintiffs have made the showing necessary under the first prong of Rule 23(b)(3).

In addition, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) sets forth the following factors to be considered in making a determination of superiority:

(A) The interest of members of the class in individually controlling the prosecution ... of separate actions;

(B) The extent and nature of any litigation concerning the controversy already commenced by ... members of the class;

(C) The desirability ... of concentrating the litigation of the claims in the particular forum; and

(D) The difficulties likely to be encountered in the management of a class action.

In general, securities suits such as this easily satisfy the superiority requirement of Rule 23. Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be "fair" nor an adjudication of their claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf. *See Green*, 406 F.2d at 296. As recently stated by the Honorable Sterling Johnson, Jr.:

A class action is also the superior method for the fair and efficient adjudication of this controversy. Thousands of investors may have claims against the Defendants. To force each [ ] shareholder to litigate separately would be unfair to each of them, as well as to Defendants. It would risk disparate results among those that sought redress and be an inefficient use of judicial resources.

*Gerber v. Computer Assocs. Int'l, Inc.,* [1995 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98, 722, at 92,400, 1995 WL 228388 (E.D.N.Y. Apr. 7, 1995) (*citing Green,* 406 F.2d at 296, 301).

In light of the creation of the three subclasses outlined above, the Court foresees no insurmountable problems in the management of this lawsuit. As held in *In re NASDAQ,* 169 F.R.D. at 528:

> The federal bench and bar must remain cognizant of the fact that difficulties in the management of class actions should not lead to a conclusion that class actions are not superior to other available means for the fair and efficient adjudication of the controversy. Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques.

(*quoting In re Sugar Industry Antitrust Litig.,* 73 F.R.D. 322, 358 (E.D.Pa.1976)).

Thus, because class action treatment is superior to any other available method for the "fair" and "efficient" adjudication of this case, the requirements of Rule 23(b)(3) are fully satisfied. If insurmountable management problems were to develop at any point, class certification can be revisited at any time under Fed.R.Civ.P. 23(c)(1).

### Conclusion

For the reasons, and with the limitations, stated above, Plaintiffs' motion for class certification is granted.

It as so ordered.