Richard WAGNER, on behalf of himself and all others similarly situated, Plaintiffs,

v.

BARRICK GOLD CORP., Randall Oliphant, John K. Carrington, and Jamie C. Sokalsky, Defendants.

Nos. 03 Civ. 4302(RMB), 03 Civ. 5059(RMB), 03 Civ. 5104(RMB), 03 Civ. 5856(RMB), 03 Civ. 6089(RMB).

United States District Court, S.D. New York.

Feb. 15, 2008.

**114**

James E. Alm, David A.P. Brower, Yvette T. Houle, Muriel P. Engelman, Philip Schechter, C.H. Smith, Brower Piven, New York City, David Kessler, Heather M. Tashman, Andrew L. Barroway, Darren J. Check, Diane Del Forno, Ira Gaines, Schiffrin Barroway, Bala Cynwyd, PA, David Avi Rosenfeld, Mario Alba, Jr., Samuel Howard Rudman, Coughlin, Stoia, Geller, Ridman & Robbins, LLP, Melville, NY, Jennifer L. Keeney, Stephen E. Connolly, Andrew L. Zivitz, Stuart Berman, Mark S. Danek, Stanley D. Cohen, Schiffrin Barroway Topaz & Kessler, LLP, Radnor, PA, Andrei V. Rado, Steven G. Schulman, Milberg, Weiss, Bershad & Schulman LLP, New York City, Charles B. Updike, Christopher Scott Milito, Randall Oliphant, John K. Carrington, Jamie C. Sokalsky, Schoeman, Updike & Kaufman, LLP, New York City, Curtis John Legeyt, Edward Han, Mark D. Wegener, Martin Francis Cunniff, Melissa R. Handrigan, Robert H. Cox, Howrey Simon Arnold & White, LLP, Washington, DC, Grace Leigh Chan, James Gerard McCarney, Howrey Simon Arnold & White, LLP, New York City, for plaintiffs.

1. For a more detailed recitation of the facts, see this Court's Order, dated September 29, 2004, resolving Defendants' motion to dismiss the Consolidated and Amended Class Action Complaint, dated November 5, 2003, and this Court's Order, dated January 31, 2006, resolving Defendants' motion to dismiss the Third Amended Complaint, dated January 6, 2005. *Wagner v. Barrick Gold Corp.*, Nos. 03 Civ. 4302(RMB), 03 Civ. 5059(RMB), 03 Civ. 5104(RMB), 03 Civ. 5856(RMB), 03 Civ. 6089(RMB), 2006 WL 268753, at *1 (S.D.N.Y. Jan. 31, 2006).

## *DECISION AND ORDER*

RICHARD M. BERMAN, District Judge.

### I. Background

In this action, filed on or about June 12, 2003, Richard Wagner, Muriel P. Engelman, Philip Schechter, Ira Gaines, C.H. Smith, and Stanley D. Cohen (collectively, "Plaintiffs"), on behalf of a putative class, allege that Barrick Gold Corporation ("Barrick"), Randall Oliphant, John K. Carrington, and Jamie C. Sokalsky (collectively, "Defendants") violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), by, among other things, "issu[ing] false and misleading statements." [1] (3d Am. Compl., dated Jan. 6, 2005, ¶ 18.)

On or about August 13, 2007, Plaintiffs moved to certify a class "consisting of all purchasers of [Barrick] securities on the New York Stock Exchange ('NYSE') and/or the Toronto Stock Exchange ('TSE') between February 14, 2002 and September 26, 2002, inclusive, . . . and who were damaged thereby," and to appoint Stanley D. Cohen ("Cohen"), Anton Del Fomo ("Del Fomo"), and Yvette T. Houle ("Houle") as class representatives, and the law firms of Schiffrin Barroway Topaz & Kessler, LLP ("Schiffrin Barroway") and Brower Piven, A Professional Corporation ("Brower Piven"), as class counsel.[2] (Pls. Notice of Mot. for Class Certification, dated Aug, 13, 2007, at 1.) Plaintiffs argue that this case "presents a prototypical situation for class treatment under Rule 23 [of the Federal Rules of Civil Procedure]," and that Plaintiffs have met "all four perquisites of Rule 23(a)" and satisfied the standard for class certification under Rule 23(b)(3). (Pls. Mem. of Law in Supp. of Mot. for Class Certification, dated Aug. 13, 2007

2. By order, dated September 18, 2003, the Court named James E. Alm, Anton Del Forno, Diane Del Forno, and Yvette T. Houle as lead plaintiffs and the law firms Schiffrin & Barroway, LLP and Milberg Weiss Bershad Hynes & Lerach, LLP ("Milberg Weiss") as co-lead counsel. By order, dated August 16, 2006, the Court substituted Brower Piven for Milberg Weiss as co-lead counsel. Milberg Weiss is no longer participating in this litigation.

("Pls.Mem."), at 1–2, 4.)[3] On or about September 13, 2007, Defendants opposed certification of the class on several grounds, arguing, among other things, that "[e]ach of the proposed class representatives ... is subject to unique defenses and therefore inadequate to represent the class"; "individual issues of reliance would predominate over common issues at trial"; the "Court lacks subject matter jurisdiction over [the Canadian] investors"; and "the class period proposed by Plaintiffs ... is too long." (Defs. Opp'n to Pls. Mot. for Class Certification, dated Sept. 13, 2007 ("Defs.Mem."), at 3, 14, 21.)[4]

Oral argument was held on February 24, 2008. (*See* Tr. of Proceedings, dated Feb. 14, 2008.).

**For the reasons that follow, the Court grants Plaintiffs' motion for class certification.**

## II. Legal Standard

To succeed on a motion to certify a class, plaintiffs first must satisfy the prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). "Second, plaintiffs must show that the putative class falls within one of the three categories set forth in Rule 23(b)."[5] *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023(DC), 2002 WL 461513, at *3 (S.D.N.Y. Mar. 26, 2002). A class can be certified under Rule 23(b)(3) if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *see also In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395–96 (S.D.N.Y.2008).

■■■ "Plaintiffs bear the burden of showing that their proposed class actions meet the four prerequisites of Rule 23(a) and the 'predominance' and 'superiority' requirements of Rule 23(b)(3)." *Fosamax*, 248 F.R.D. at 395–96. "A court must conduct a 'rigorous analysis' to determine if those requirements are met, resolving any factual disputes relevant to the Rule 23 analysis." *Id.* (citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 29 (2d Cir.2006)). "In considering whether to certify a class, a court may not address the merits of the action except to the extent that the merits issue overlaps with a Rule 23 requirement." *Id.* (citing *Initial Pub. Offering*, 471 F.3d at 41).

## III. Analysis

### Rule 23(a)(1): Numerosity

■■■ "Plaintiffs believe that there are at least hundreds, and likely thousands of members of the class." (3d Am.Compl. ¶ 50.) According to Plaintiffs, during the class period, "Barrick had approximately 543 million

---

3. In support of their motion for class certification, Plaintiffs submitted the Declaration of Elizabeth A. Schmid, Esq., dated August 13, 2007 ("Schmid Decl.") with exhibits, including, among others, the Declaration of Plaintiffs' expert, Scott D. Hakala, Ph.D, CFA, dated March 16, 2007 ("Hakala Decl.") and the Defendants' Rebuttal Expert Report of Professor Michael Goldstein, Ph.D., dated April 27, 2007. Plaintiffs also filed a reply memorandum, dated September 27, 2007 ("Pls.Reply").

4. In opposition to Plaintiffs' motion for class certification, Defendants submitted the Affidavit of Charles B. Updike, dated September 13, 2007 ("Updike Aff.") with exhibits.

5. The Rule 23(b) categories "encompass class actions where: (1) prosecution of separate actions by individual parties either would create a risk of inconsistent adjudications or would be dispositive of the interests of those members not parties to the adjudication; (2) defendants have acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to members of the class predominate, and a class action is superior to other available methods for adjudication." *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 256 (S.D.N.Y.2007) (citing Fed.R.Civ.P. 23(b)).

shares of common stock outstanding which were actively traded on the [NYSE]," (3d Am.Compl. ¶ 50), and the "average daily trading volume ... was 3,983,826 shares." (Hakala Decl. ¶ 6.) Defendants do not appear to dispute that the proposed class is numerous (and that joinder would be impractical). (*See* Defs. Mem. at 1–25.) "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y.2007) (quoting *Teachers' Ret. Sys. of La. v. ACLN Ltd.*, No. 01 Civ. 11814(LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004)). "Class certification is frequently appropriate in securities fraud cases involving a large number of shares traded publicly in an established market." *In re Deutsche Telekom Ag Sec. Litig.*, 229 F.Supp.2d 277, 280–81 (S.D.N.Y.2002) (citing *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 123 (S.D.N.Y.1997)).

### Rule 23(a)(2): Commonality

Plaintiffs assert that common legal and factual issues include, among others, "whether Defendants violated the federal securities laws" and "whether statements made by Defendants to the investing public ... misrepresented or omitted to disclose material facts about the business and operations of Barrick." (Pls. Mem. at 6.) Defendants do not appear to dispute commonality. (*See* Defs. Mem. at 1–25.) Rule 23(a)(2) "does not require that every question of law or fact be common to each class member." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL. 1484(JFK), 2007 WL 4526593, at *6 (S.D.N.Y. Dec. 20, 2007) (citation omitted). "The commonality requirement has been applied permissively in the context of securities fraud litigation." *Id.* (quoting *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y.2006)).

### Rule 23(a)(3): Typicality

Defendants argue, among other things, that "[e]ach of the proposed class representatives ... is subject to unique defenses" and

are "atypical of other class members." (Defs. Mem. at 14.) Specifically, Defendants say that (1) "Del Forno lacks standing to sue" because he is "purportedly suing on behalf of ... Pelmar Investment Club [and] RAP Partners"; (2) Houle "relied on the advice of a professional investment advisor and not on the efficiency of the market," and "she bought Barrick stock after the end of the [c]lass [p]eriod"; and (3) Cohen "is a sophisticated broker." (Defs. Mem. at 15–18.) Plaintiffs respond stating, among other things, that (1) Del Forno had "complete investment authority and was the agent and attorney in-fact with full power and authority to bring a suit to recover for investment losses"; (2) "Houle's reliance on a former stockbroker does not render her atypical," and she was " 'averaging-down' her investment" by purchasing after the class period; and (3) Cohen's occupation as "an investment advisor does not automatically render [him] a sophisticated investor." (Pls. Reply at 5, 7 & n. 14 (citations and internal quotations omitted).)

■ " '[T]he claims of the class representatives [must] be typical of those of the class, and [typicality] is satisfied when each class member's claim arises from the same course of events, and each class [as here] member makes similar legal arguments to prove the defendant's liability.' " *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir.2007) (quoting *Robinson v. Metro–N. Commuter R.R.*, 267 F.3d 147, 155 (2d Cir.2001)).

### Del Forno

■ At his deposition on June 6, 2007, Del Forno explained that the "Pelmar Investment Club [and RAP Partners] was made up of [him]self and ... other family members," and Del Forno "would have been considered the general partner" and "the one that made the decisions." (Schmid Decl., Ex. 8 ("Del Forno Dep.") at 10:23–24, 12:3–4, 16:17, 17:9–22.) "[I]nvestment manager[s] ha[ve] standing to sue on behalf of ... investors as long as [the managers] ha[ve] ... unrestricted decision-making authority." *Corwin v. Seizinger*, Nos. 07 Civ. 6728(DC),

07 Civ. 7016(DC), 07 Civ. 7476(DC), 2008 WL 123846, at *4 (S.D.N.Y. Jan. 8, 2008) (citing *Kaplan v.Gelfond*, 240 F.R.D. 88, 95 (S.D.N.Y.2007). Even if Del Forno did not have "unrestricted decision-making authority" to invest for his family members, he "has standing in his own right to serve as class representative [because] he purchased shares of Barrick stock ... *on his own behalf* and suffered the same losses as other [c]lass [m]embers." (Pls. Reply at 5–6; *see also* Del Forno Dep. at 31:10–19 ("[T]his [trade] would have been [in] my own account because ... it's got only my name on it. And I do also have an account in my name only.")); *Vivendi*, 242 F.R.D. at 87 (citations omitted).

**Houle**

 At her deposition on June 20, 2007, Houle testified that when "making a decision whether to purchase or sell securities in [a] company," she looks at the company's "balance sheet and [its] profit and loss statements [and its] earnings ... per share or loss," among other things. (Schmid Decl., Ex. 9 ("Houle Dep.") at 41:1424.) Houle also explained that before making an investment decision she and her investment advisor "go to the company's website ... [and] look at the financial analysts and what they have to say regarding the companies that [Houle and her advisor] are interested in." (Houle Dep. at 43:12–18.) "[A]n investor may rely on the advice of brokers and still not be subject to a unique defense so long as [s]he also relied on other information such as financial statements or the integrity of the market." *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 70 n. 8 (S.D.N.Y.2000) (citing *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 195 (S.D.N.Y.1985)); *see also Dietrich v. Bauer*, 192 F.R.D. 119, 125 (S.D.N.Y.2000) ("[E]very investor ... will presumably have relied on differing amounts of publicly-available information in making his or her investment decisions."). And, "the subsequent purchase of stock by [a] plaintiff d[oes] not render his claim atypical [because] the 'subsequent purchase is ... a common investment technique used to decrease the average cost of the investment.'" *Garfinkel v. Memory Metals, Inc.*, 695 F.Supp. 1397, 1404 (D.Conn.1988)

(quoting *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 n. 4 (S.D.N.Y.1984)).

**Cohen**

 At his deposition on June 29, 2007, Cohen testified that, before investing in Barrick stock in 2002, he consulted ValueLine, "an investment survey [that] covers about 1700 of the biggest most actively traded stocks in the United States." (Schmid Decl., Ex. 10 ("Cohen Dep.") at 81:15 to 82:3.) Cohen used ValueLine to "look at the balance sheet to see how strong it is and [to look at] the[ ] cash flow to see if it's remaining positive." (Cohen Dep. at 82:10–12.) He stated, "I just went over to the library and made a copy of [ValueLine] ... and read it when I got some time." (Cohen Dep. at 83:5–7.) It does not appear that Cohen relied on research material or used investment guide(s) that were not available to the general investing public. "[C]ourts have held that sophistication of the class representative does not necessarily mean 'his claim arises any less from the same course of events and raises the same legal liabilities as every other member of the putative class.'" *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y.2007) (quoting *Cross v. 21st Century Holding Co.*, No. 00 Civ. 4333(MBM), 2004 WL 307306, at *3 (S.D.N.Y. Feb. 18, 2004)); *see also Modell v. Eliot Sav. Bank*, 139 F.R.D. 17, 22 (D.Mass.1991) (A plaintiff's "status as a [stockbroker] renders him neither devoid of the protection of the securities laws nor immune to injury by misrepresentation.").

**Rule 23(a)(4): Adequate Representative**

 Defendants argue, among other things, that the proposed class representatives "have not fulfilled their fiduciary duty to monitor the litigation and educate themselves about basic facts of the lawsuit," and have "abdicated responsibility for control, direction, and prosecution of the lawsuit to [their] lawyers." (Defs. Mem. at 19.) Plaintiffs say that each of the proposed class representatives "have responded to detailed written discovery and [have] been deposed," they have "demonstrated extensive knowledge of the claims asserted ... in the [Third

Amended Complaint]," and "will continue to supervise [their] counsel as this litigation progresses." (Pls. Mem. at 13–14 (internal citations omitted).) "[A]dequacy of representation entails inquiry as to whether . . . plaintiff's interests are antagonistic to the interest of other members of the class and . . . plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.2000) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992)). Defendants do not appear to have provided probative evidence that there are antagonistic interests between the proposed class representatives and other class members, or that Plaintiffs' counsel are unqualified, and instead rely on "attack[ing] the character and intelligence of the [proposed class representatives]." (Pls. Reply at 7.)

■■■■■ "[I]t is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected." *Vivendi*, 242 F.R.D. at 88 (citations and internal quotation marks omitted); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 161 (S.D.N.Y.2007) (quoting *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1416 (E.D.N.Y.1989) (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966))). "It is sufficient if the class representatives are 'aware of the basic facts underlying the lawsuit and . . . not . . . likely to abdicate his obligations to fellow class members.'" *Id.* (quoting *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39, 41 (E.D.N.Y.1991)). "[A] class representative will be found inadequate due to ignorance only when they 'have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *In re WorldCom Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y.2003) (quoting *Baffa*, 222 F.3d at 61).

## Rule 23(b)(3)

### Predominance of Common Questions of Law or Fact

Defendants argue that common questions of law or fact do not predominate because, among other things, the "fraud on the market presumption . . . is unavailable because Plaintiffs failed (1) to provide evidence establishing loss causation; and (2) [failed] to show that the market for Barrick stock is efficient." (Defs. Mem. at 3.) Plaintiffs contend that they (1) "need not provide evidence of loss causation at [the] class certification [stage]" in order to invoke the fraud on the market doctrine, but, in any event, Plaintiffs' expert, Dr. Scott Hakala, "has demonstrated the existence of loss causation"; and (2) Dr. Hakala also "demonstrate[d] that the market for Barrick stock was efficient during the [c]lass [p]eriod." (Pls. Reply 2 & n. 2, 3–4.)

### Loss Causation

Defendants acknowledge that, while the "Second Circuit has not addressed the issue of whether loss causation must be established to trigger the fraud on the market presumption," courts "within the Second Circuit . . . have certified classes despite the lack of evidence of loss causation." (Defs. Mem. at 5 n. 1.) Such a result appears consistent with the United States Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). There is "no need to engage in the kind of factual analysis . . . that manifests the oddities of applying a rebuttable presumption of reliance in this case." *Id.* at 249 n. 29, 108 S.Ct. 978; *see also Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 272 (5th Cir.2007) (Dennis, J., dissenting) ("the majority departs drastically from the Supreme Court's decision in Basic"); *In re Micron Techs., Inc. Sec. Litig.*, No. 06 Civ. 85–S, 2007 WL 4553749, at *5–6 (D.Idaho Dec. 19, 2007) ("It is unlikely that [*Oscar*] would be adopted in this Circuit because it misreads *Basic*."). In a recent decision, this Court (Conner, J.) found that because plaintiffs could "*conceivably* prove loss causation, they [we]re appropriately counted as members of the proposed class." *Flag Telecom*, 245 F.R.D. at 167 (emphasis added) (quoting

*Roth v. Aon Corp.,* 238 F.R.D. 603, 608 (N.D.Ill.2006)).[6]

■■■■ Even if proof of loss causation were a prerequisite at this stage, Plaintiffs have satisfied the requirement. That is, "[l]oss causation can be established either where . . . the market reacted negatively to a corrective disclosure or . . . the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss." *In re Omnicom Group, Inc. Sec. Litig.,* 541 F.Supp.2d 546, 550–51 (S.D.N.Y.2008) (citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 (2d Cir.2005)). Plaintiffs' expert, Dr. Hakala, testified at his deposition on June 27, 2007, that the press release from September 26, 2002 (Barrick "expects 2002 earnings per share in the 33–35 cent range . . . compared to earlier guidance for earnings at the lower end of the 42–47 cent range" (Updike Aff., Ex. A., at 1)), "and possibly later events, are corrective in nature . . . [and] there clearly was a loss associated with those events." (Schmid Decl., Ex. 16 ("Hakala Dep.") at 77:23 to 78:2; *see also* Hakala Decl. 15–16.) Defendants' own expert, Dr. Goldstein, testified at his deposition on July 12, 2007, that his "gut feeling" was that the drop in Barrick's stock price on September 26, 2002 was "related to the press release." (Schmid Decl., Ex. 11 ("Goldstein Dep.") at 170:21–22.) In *Flag Telecom,* the plaintiffs' expert (Dr. Hakala) found that "[f]urther revelations of problems, including specific news concerning Flag Telecom, adversely affected the share price of Flag Telecom," and the Court held that "[i]n light of Hakala's affidavit, we agree that the record shows that [plaintiffs] . . . may be able to . . . prove loss causation." 245 F.R.D. at 166–67; *see also In re Winstar Commc'ns,* Nos. 01 Civ. 3014(GBD), 01 Civ. 11522(GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006).

**Market Efficiency**

Defendants argue that "Plaintiffs attempt to establish class-wide reliance by invoking the fraud on the market presumption fails because they have not shown by a preponderance of the evidence that Barrick shares traded on an efficient market." (Defs. Mem. at 10.) Plaintiffs counter that they "have provided persuasive evidence that the market for Barrick securities was efficient throughout the [c]lass [p]eriod." (Pls. Mem. at 18.)

■■■■ To determine whether the market for a security is efficient, courts consider, among other factors, (1) "the [stock's] average . . . trading volume"; (2) "the number of securities analysts following and reporting on the stock"; and (3) "the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* No. 05 Civ. 1898(SAS), 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006) (citing *Cammer v. Bloom,* 711 F.Supp. 1264, 1286–87 (D.N.J.1989)). And, if "a security is listed on the NYSE . . . or a similar national market, the market for that security is presumed to be efficient." *Id.* at *8 (citations omitted). Analysis of these factors leads to the conclusion that the market for Barrick stock is efficient.

Plaintiffs' expert "found strong evidence for the level of market efficiency required for class certification," and "found no evidence of an undeveloped or inefficient market with respect to the trading of the common shares of Barrick." (Hakala Decl. ¶ 5.) Specifically, Dr. Hakala concluded (persuasively) that (1) the "average daily trading volume . . . was 3,983,826 shares"; (2) "Barrick was actively covered by a number of brokerage firms and other analysts," including, among others, "Prudential Financial, CIBC World Markets, Bear Sterns, Deutsche Bank, JP Morgan and BMO Nesbitt Burns"; and (3) "the share price fell 10.52% relative to the market and industry indices on September 26, 2002 as a result of the [press release]."[7] (Hakala

---

**6.** But see *Oscar* for the proposition that "loss causation must be established at the class certification stage by a preponderance of all admissible evidence." 487 F.3d at 269.

**7.** "In order to assess the reaction of Barrick's share price to relevant news events, [Dr. Hakala] performed an event study." (Hakala Decl. ¶ 10); *see also Flag,* 245 F.R.D. at 170 ("[N]umerous courts have held that an event study is a reliable

Decl. ¶¶ 5(e), 6, 8.) And, Defendants' expert testified that stocks traded on the New York Stock, like Barrick stock, "probably trade in a very efficient market." (Goldstein Dep. at 81:4–5). Based upon similar evidence, courts in this Circuit routinely have concluded that a security's market was efficient. *See, e.g., Flag,* 245 F.R.D. at 169–70.

### Superiority of Class Action

Plaintiffs contend that this case is best maintained as a class action because, among other things, "there is no reason to expect any difficulties in the management of this [case] as a class action," and "securities class actions of the size and complexity of this [one] are common." (Pls. Mem. at 23.) Appropriately, Defendants do not appear to contest this element. (*See* Defs. Mem. at 1–25.)

"In general, securities suits such as this easily satisfy the superiority requirement of Rule 23." *In re Blech Sec. Litig.,* 187 F.R.D. 97, 107 (S.D.N.Y.1999). "Most violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *Id.* "Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims." *Id.*

### Subject Matter Jurisdiction and Breadth of the Class

Defendants argue, among other things, that (1) the "Court's subject matter jurisdiction under U.S. securities laws does not extend to foreign [Canadian] purchasers who bought the securities at issue on a foreign stock exchange [TSE]," and (2) the class period should be limited because "the first allegedly fraudulent statement relating to the costs and earnings projections claim did not occur until May 1, 2002." (Defs. Mem. at 21, 23.) Plaintiffs argue, among other things, that (1) "Barrick's activities in the United States easily satisfy [the] test[s] for subject matter jurisdiction," (Pls. Mem. at 24), and

(2) an "attempt[ ] to bifurcate [the] proposed class period[ ]" is improper where, as here, "fraudulent conduct is alleged to have been carried out over a period of time affecting the integrity of the market in publicly traded securities." (Pls. Reply at 10 (citation omitted).)

### Canadian Purchasers

Defendants say that "Plaintiffs fail to show that the alleged fraud arose directly from any conduct within the United States," (Defs. Mem. at 24), and "Barrick's employees located in Toronto, Canada were . . . responsible for reviewing and approving Barrick's press releases in 2002 before they were issued to the public." (Updike Aff., Ex. S (Decl. of Sybil E. Veenman, dated Sept. 12, 2007) ¶ 3.) Plaintiffs say that "Defendants made many public filing with the NYSE and the SEC, and disseminated the alleged materially misleading statements within the United States." And, these alleged materially misleading statements, "inflated Barrick's stock price similarly on both the NYSE and TSE." (Pls. Mem. at 24–25 (citing Hakala Decl. ¶ 9 n. 8).)

■■ "Since the Securities Exchange Act is silent as to its extraterritorial application, courts have developed two tests for determining the subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd.,* 148 F.R.D. 105, 108 (S.D.N.Y.1993).

> Under the "conduct" test, a federal court has subject matter jurisdiction if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad. A federal court also has jurisdiction under the "effects" test where illegal activity abroad causes a "substantial effect" within the United States.

*Id.* (citing *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991)). Defendants' activities in the United States satisfy the conduct test because, among other reasons, "Barrick's common stock trades in the United States over

method for determining market efficiency and the market's responsiveness to certain events or

information.'').

the [NYSE] and [Barrick] regularly files financial statements with the [NYSE]," (3d Am.Compl. ¶ 29), "Barrick collaborated with [U.S. bank] J.P. Morgan in pioneering the 'spot deferred sales contract,'" (3d Am. Compl. ¶ 75), and "[o]ne of the most important of all the Barrick mines was the Meikle Mine, which together with the Betze–Post Mine, make up the Goldstrike Property in North–Central Nevada." (3d Am.Compl. ¶ 112.) In *Leonard v. Garantia Banking Ltd.*, the Court found that "the trading of [stock] on the NYSE satisfie[d] the conduct test" because there were also factors "that constitute[d] conduct which 'tip[ped] the scales' in favor of this Court sustaining jurisdiction," including, among others, the company's "economic activity in the United States," and its "use of New York City bank accounts to receive ... funds." No. 98 Civ. 4848(LMM), 1999 WL 944802, at *6 (S.D.N.Y. Oct. 19, 1999); *see also In re Gaming Lottery Sec. Litig.*, 58 F.Supp.2d 62, 76 (S.D.N.Y.1999) ("[T]he factors weighing in favor of jurisdiction ... extend beyond [the defendant's] mere ownership of American assets, and relate to an alleged fraudulent scheme in which persons purchasing on American and Canadian exchanges were, in similar measure and in similar fashion, the intended as well as the actual victims of an integrated fraudulent scheme.").

**Class Period**

Defendants argue, among other things, that it is improper to certify a class period for both Plaintiffs' cost and earnings projection claim and the Gold Sales Program claim "[b]ecause the first purportedly fraudulent statement relating to the costs and earnings projections did not occur until May 1, 2002." (Defs. Mem. at 22.) Plaintiffs counter, among other things, that "[w]hen plaintiffs allege ... a single common thread to which all the fraudulent activity related, class certification is appropriate." (Pls. Reply at 9 n. 19 (citation and emphasis omitted).)

The class period is appropriate. *See Flag*, 245 F.R.D., at 174; *see also Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir.1982). Defendants acknowledge that "Plaintiffs continue to assert a broad, unified fraudulent scheme," (Defs. Mem. at 4), and

the Court has (already) determined, among other things, that "the market understood that Barrick's revision of projected earnings was related to the Gold Sales Program." (*See* Order, dated Jan. 31, 2006, at 6–7) (citations omitted); *see also Flag*, 245 F.R.D. at 174.

**IV. Conclusion and Order**

For the reasons stated above, the Court grants Plaintiffs' motion for class certification [Dkt. No. 90] and appointment of class representatives and class counsel.

**The parties are directed to appear for a settlement conference with principals before the Court on March 7, 2008 at 11:00 a.m. in Courtroom 21D at the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York, and are to engage in good faith settlement discussions prior to the conference.**